Filed 9/22/21  P. v. Arnold CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C091128 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE001123) |
| v. | |
| BRIAN WINFIELD ARNOLD, | |
| Defendant and Appellant. | |

A jury found defendant Brian Winfield Arnold guilty of numerous sex offenses arising out of the repeated molestation of his grandnephew B., including 11 counts of willfully committing a lewd and lascivious act upon a child under the age of 14 years (Pen. Code, § 288, subd. (a))[1] and three counts of oral copulation or sexual penetration

---

[1] Undesignated statutory references are to the Penal Code.

1

with a child 10 years of age or younger (§ 288.7, subd. (b)).[2]  The trial court sentenced him to 73 years to life in prison; he timely appealed.

Defendant now contends reversal is required for a number of reasons, including the trial court's failure to declare a doubt as to his competence to stand trial and order a competency evaluation, insufficiency of the evidence, evidentiary error, judicial misconduct, and cumulative error.  We reject these contentions and affirm the judgment.

## BACKGROUND

Defendant is the great-uncle of B., born in December 2007.  At the time of trial (September and October 2019), B. was 11 years old.  The incidents of molestation giving rise to this case occurred between December 18, 2014, and June 5, 2016, when B. was seven and eight years old and defendant was 58 to 60 years old.

At all relevant times, B.'s great-grandparents and defendant lived in separate houses on the same property in Sacramento.  At trial, B. described defendant as a "[g]ood guy all around," a "nice guy," and a "[b]est friend."  They spent holidays together with family and hung out often, including watching soccer on television, playing games, and visiting museums.

When B. went to defendant's house, he and defendant played a game that required them to get to the "zombie safe zone," which was located in a narrow alleyway between B.'s great-grandparents' house and defendant's house.  Defendant taught B. that, once inside the zombie safe zone, they needed to pull their pants and underwear down.  On numerous occasions, defendant molested B. while they were in the zombie safe zone.  He touched B.'s penis and buttock with his hand and mouth and made B. touch his penis and buttock.  Defendant taught B. that if anyone approached them in the zombie safe zone, B. needed to come up with an excuse for their actions and "play it cool."  Defendant told B.

---

[2]  The jury also found defendant not guilty of one section 288, subdivision (a) count and one section 288.7, subdivision (b) count.

2

the touching was "super special and good" and "something special" that only he got. B. believed and trusted defendant because everyone thought he was a good guy, everyone trusted him, and he was always nice to B.

Defendant also molested B. in various other places, including in defendant's bathroom on Thanksgiving, in a bedroom at defendant's house on Easter, at a train museum and thereafter at defendant's house on "Uncle Brian Day," during a sleepover at B.'s house, and in a park bathroom during a birthday party. These incidents of molestation collectively included defendant touching B.'s penis and buttock with his hand and mouth, and defendant inserting his finger into B.'s anus. On a few of these occasions, B. touched defendant's penis.

During the incident of molestation that occurred at the birthday party, B.'s grandfather observed defendant take B. to the bathroom and followed them. After hearing B. "moaning with stress in his voice," grandfather opened the stall door. At that moment, he saw defendant, who was standing behind B. in the far corner of the stall approximately five feet from the toilet, touching the zipper area of B.'s pants. Defendant immediately threw his hands up and backed away quickly. The grandfather reported what he saw to B.'s father. Several days later, the father contacted the police.

Thereafter, B. attended counseling and participated in a SAFE (Sexual Assault Forensic Examiner) interview, which was recorded and played for the jury. He was nine years old at the time of the interview. B. described the molestation, which he indicated began when he was five or six years old. He explained that the molestation largely occurred in the zombie safe zone and involved defendant touching his penis and buttock with his hand and mouth. He explained the zombie safe zone was accessed by passing through multiple gates, which allowed B. and defendant to hear if anyone was coming towards them. If they heard someone approaching, defendant taught B. to put his clothes back on and give the person an excuse as to what they were doing. Over the course of the interview, B. discussed several specific incidents of molestation, including the sleepover

3

incident at his house, "Uncle Brian Day," and the birthday party incident. B. recalled that defendant touched his penis and buttock during each incident of molestation and digitally penetrated his anus on several occasions, including the incident that occurred on Easter and during the sleepover at his house. When asked, B. estimated that defendant had touched him approximately 10 to 60 times, explaining that defendant always touched him multiple times when they spent time together and that he did not keep track of how many times. B. complied with defendant's sexual demands because he did not want defendant to stop being his friend and he was afraid defendant would punish him. B. noted that defendant instructed him not to tell anyone about the molestation.

Defendant testified on his own behalf at trial. He denied molesting B. Defendant's wife, daughter, and other family members also testified for the defense.

## DISCUSSION

### I

### *Competence to Stand Trial*

Defendant contends the trial court erred in denying his request to declare a doubt as to his competence to stand trial and order a competency evaluation. He argues relief was warranted because substantial evidence was presented raising a reasonable doubt as to his ability to assist counsel in his defense. We see no error.

A. *Additional Background*

In January 2018, defendant was charged by felony complaint. In March 2019, the matter was assigned to a courtroom for jury trial. On that same day, defense counsel advised the trial court that defendant had been diagnosed with cancer and would likely need "emergency surgery." Thereafter, at the request of the defense, the trial was continued multiple times due to defendant's medical condition. Finally, on September 18 and 24, 2019, the trial court denied the defense's requests to continue trial. The court scheduled jury selection to begin on September 30, and indicated that, due to defendant's medical condition, trial proceedings would end at noon each day.

4

On September 30, defense counsel declared a doubt as to defendant's competence to stand trial and requested the court order a competency evaluation pursuant to section 1368, asserting that defendant was suffering from "post-chemo cognitive impairment," that made it "almost impossible for [counsel] to work with him." In support of his request, defense counsel explained that defendant was having difficulty focusing, understanding, and remembering things, and indicated that counsel had consulted with a psychologist (and cancer survivor), who told him that chemotherapy causes haziness, memory loss, and impairment. Defense counsel represented that he had also reviewed a "plethora" of medical articles on the effect of chemotherapy on cognitive functioning. He requested a competency evaluation based on what he characterized as a good-faith declaration of doubt regarding defendant's competence to stand trial.

When the trial court asked defense counsel if he had filed anything in support of his request, counsel pointed to a declaration that had been executed by co-counsel a week earlier but filed that day, which asserted that defendant was unable to assist in his defense at trial due to his medical condition. After reviewing the declaration, the trial court stated that it did not contain anything suggesting defendant was incompetent, noting that the only thing that remotely touched on competency was defendant's difficulty concentrating on questions posed in preparation of his defense and frequent requests that questions from counsel be repeated. The court noted that, aside from this declaration and its own observations of defendant over many months, there was nothing else for it to consider in ruling on the defense's request, including any evidence supporting the observations of defense counsel. The court stated that defendant seemed "completely sound" from a "mental point of view," noting that there was nothing before the court showing "any mental competency issues at all." When asked, defense counsel indicated that the psychologist he consulted with had not engaged in a clinical diagnosis of defendant or interviewed defendant for purposes of his competence to stand trial. Defense counsel

5

stated that the psychologist had interviewed defendant but he could not recall when the interview occurred, although he noted it was not "in the last few days."

After the trial court asked defendant a series of questions related to the nature of the proceedings, his willingness to assist in his defense, and his medical condition, and heard argument from counsel (which included the prosecutor pointing out that defendant's chemotherapy treatments had ended several months earlier), the court denied the defense's request to declare a doubt as to defendant's competence to stand trial and order a competency evaluation.[3] In doing so, the trial court relied on the lack of evidence supporting such relief and its own observations of defendant. The court noted that defendant had completed his medical treatments four months earlier, and found that defense counsel's declaration of doubt as to defendant's competence was not well-founded and questioned whether it was made in good faith, also noting that the continuance was requested prior to the request for the competency evaluation. It found no evidence before it about "chemo brain," including how chemotherapy affects a person's memory four months after treatment, and that it did not see any evidence of that "particular concern." The court stated that defendant "clearly understands what we are doing here in court" and was able to express himself in a logical, cogent, and linear manner.[4]

---

[3] As part of his argument, defense counsel noted that he had filed numerous declarations over the past several weeks that indicated defendant was unable to effectively assist counsel. In ruling on the competency issue, the trial court stated that it had reviewed all the declarations that had been filed by the defense but could not "recall a particular emphasis on [defendant's mental] competency" in any of those declarations, although the court noted that counsel had expressed a concern about defendant's forgetfulness in connection with the most recent motions to continue trial.

[4] In his opening brief, defendant concedes that his answers to the trial court's questions "showed he understood the process fairly well."

B. *Applicable Legal Principles*

" 'Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent.' [Citations.] 'A defendant is incompetent to stand trial if [he] is unable to consult with [his] attorney with a reasonable degree of rational understanding or lacks a rational and factual understanding of the proceedings against [him].' " (*People v. Woodruff* (2014) 5 Cal.5th 697, 720-721.) The threshold for competence is low. "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." (*Godinez v. Moran* (1993) 509 U.S. 389, 402.) "Competence to stand trial requires 'the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense.' " (*People v. Johnson* (2018) 21 Cal.App.5th 267, 276.)

"[S]ection 1368 requires that criminal proceedings be suspended and competency proceedings be commenced if 'a doubt arises in the mind of the judge' regarding the defendant's competence (*id.*, subd. (a)) and defense counsel concurs (*id.*, subd. (b))." (*People v. Rodas* (2018) 6 Cal.5th 219, 231; see also *People v. Wycoff* (2021) __ Cal.5th __ [2021 Cal. LEXIS 5998, at p. *46] (*Wycoff*).) Our Supreme Court has determined that a competency hearing is also required if defense counsel informs the trial court that he or she has a doubt as to the defendant's competency and produces substantial evidence that the defendant is not competent: "[O]nce the accused has come forward with *substantial evidence* of incompetence to stand trial, due process *requires* that a full competence hearing be held as a matter of right." (*People v. Welch* (1999) 20 Cal.4th 701, 738.) A competency hearing is required under such circumstances "no matter how persuasive other evidence -- testimony of prosecution witnesses or the court's own observations of the accused -- may be to the contrary.' " (*Wycoff, supra,* ___ Cal.5th __ [2021 Cal. LEXIS 5998, at p. *50.) " 'When faced with conflicting evidence regarding competence,

7

the trial court's role under . . . section 1368 is only to decide whether the evidence of incompetence is substantial, not to resolve the conflict. Resolution must await expert examination and the opportunity for a full evidentiary hearing.' [Citation.] In other words, once a trial court has before it substantial evidence that a defendant is not mentally competent, its own observations of the defendant's competence cannot take the place of the formal competence inquiry under sections 1368 and 1369." (*Wycoff*, at p. *48.)

"When a doubt exists as to the defendant's mental competence, the court must appoint an expert or experts to examine the defendant. The issue is then tried to the court or a jury under the procedures set out in . . . section 1369. Except as provided in . . . section 1368.1 (allowing for probable cause and motion hearings in certain circumstances), all criminal proceedings are to be suspended until the competence question has been determined." (*People v. Rodas*, *supra*, 6 Cal.5th at p. 231.)

" 'The decision whether to order a competency hearing rests within the trial court's discretion, and may be disturbed upon appeal "only where a doubt as to [mental competence] may be said to appear as a matter of law or where there is an abuse of discretion." . . . On review, our inquiry is focused not on the subjective opinion of the trial judge, but rather on whether there was substantial evidence raising a reasonable doubt concerning the defendant's competence to stand trial. [Citation.] . . . A trial court reversibly errs if it fails to hold a competency hearing when one is required under the substantial evidence test.' " (*People v. Woodruff, supra*, 5 Cal.5th at p. 721; see *People v. Rogers* (2006) 39 Cal.4th 826, 847 (*Rogers*) ["A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial"].)

Substantial evidence of incompetence is evidence "that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." (*Rogers*, *supra*, 39 Cal.4th at p. 847.) Such evidence "may emanate from several sources, including the

8

defendant's demeanor, irrational behavior, and prior mental evaluations." (*Ibid.*) "The word 'substantial' does not mean that for a doubt to arise, there must be a large quantity of evidence of a defendant's incompetence; rather, it means that there must be some evidence of sufficient substance that it cannot be dismissed as being inherently unpersuasive." (*Wycoff, supra*, __ Cal.5th __ [2021 Cal. LEXIS 5998, at p. *48].)

While a defense counsel's declaration of doubt as to the defendant's competence supports holding a competency hearing, it is not sufficient to require one. " 'Counsel's assertion of a belief in a client's incompetence is entitled to some weight. But unless the court itself has declared a doubt as to the defendant's competence, and has asked for counsel's opinion on the subject, counsel's assertions that his or her client is or may be incompetent does not, in the absence of substantial evidence to that effect, require the court to hold a competency hearing.' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 465.) The doubt which triggers the obligation to order a competency hearing is determined objectively from the record. (*People v. Johnson, supra,* 21 Cal.App.5th at p. 276.) The question is whether a reasonable jurist, with the benefit of the available information, would have developed a doubt as to defendant's mental competence. (*Ibid.*)

C. *Analysis*

As an initial matter, we agree with the People that defendant has forfeited his claim of error. In his opening brief, defendant insists that substantial evidence was presented in the trial court raising a reasonable doubt as to his competence to stand trial, but he failed to support his argument with any citation to the appellate record. Thus, he violated the rule that as the appellant he is required to direct the reviewing court to the parts of the record that show the claimed error. (See *Green v. City of Los Angeles* (1974) 40 Cal.App.3d 819, 835; Cal. Rules of Court, rule 8.204(a)(1)(C).)[5] It is not enough for

---

[5] All further rule references are to the California Rules of Court.

the appellant to provide citations to the record in the factual background portion of their opening brief; the appellant must also provide pertinent citations to the record in the argument portion of their brief. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16.)

In his reply brief, defendant belatedly provides citations to the appellate record in support of his position and erroneously suggests that his citations to the appellate record in the statement of facts portion of his opening brief are sufficient to avoid forfeiture. "Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument." (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.) Thus, an appellant is required to provide pertinent citations to the record in the argument portion of their opening brief. (*City of Lincoln v. Barringer, supra*, 102 Cal.App.4th at p. 1239, fn. 16.) Because defendant's argument in his opening brief is devoid of references to the appellate record, this is an appropriate case to apply the forfeiture rule.

Even were we to overlook this deficiency, we would reject defendant's claim of error on the merits. The record simply does not disclose substantial evidence raising a reasonable doubt as to defendant's competence to stand trial. As we have discussed, it is not disputed that defendant answered the trial court's questions regarding competence in a manner that did not evidence incompetence. The primary evidence relied on by defendant in the trial court was a declaration submitted by one of his attorneys. The half-page conclusory declaration stated as follows: (1) defendant was under medical distress and acute physical discomfort in recent meetings; (2) defendant had difficulty concentrating on questions posed to him in preparation of his defense and frequently asked for the questions to be repeated; (3) defendant went to the bathroom three times over the course of 20 minutes, was "fine" for the next 45 minutes, and then went to the bathroom twice in the following 15 minutes; (4) during a three-hour meeting with defendant, "the conversation constantly digressed to his current medical symptoms and/or

10

his bleak medical prognosis"; and (5) in counsel's opinion, defendant cannot assist in his own defense due to his medical condition. In his reply brief on appeal, defendant points to a declaration executed by lead trial counsel that was filed in support of his motion to continue trial but was signed approximately one week *before* counsel declared a doubt as to defendant's competence. As relevant here, the declaration (which defense counsel vaguely referenced at the hearing on the competency issue) stated that, according to defendant's treating physician, the new medication prescribed to defendant would affect his cognitive functioning for at least 30 days, including compromising his ability to focus. The declaration further stated that, research conducted by counsel, showed that the new medications would impact defendant's mood, stability, and clarity, and that counsel had personally witnessed defendant be forgetful and non-linear in his thinking and memory.

After review of the record, we cannot conclude the trial court erred. The evidence in the record does not raise "a reasonable or bona fide doubt concerning the defendant's competence to stand trial." (*Rogers*, *supra*, 39 Cal.4th at p. 847.) The defense's assertion that defendant was incapable of assisting counsel in his defense due to memory impairment and other side effects from his cancer treatment was not supported by any mental health testimony or other evidence directly from a treating physician or mental health expert (e.g., mental evaluation, medical report) who had recently examined defendant and offered an opinion as to his mental condition, including an opinion as to how the newly prescribed medication was affecting his cognitive functioning. (See *People v. Sattiewhite, supra*, 59 Cal.4th at p. 465 [" '[I]f a qualified mental health expert who has examined the defendant " 'states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel,' " that is substantial evidence of incompetence.' "]; *Wycoff*, *supra*, __ Cal.5th __ [2021 Cal. LEXIS 5998, at pp. *55-56]

11

[professional opinion of mental health expert in formal report addressed to the trial judge may constitute substantial evidence of incompetence].) Nor was it evidenced by any interactions with the court. A doubt as to defendant's mental competence does not appear as a matter of law and no abuse of discretion appears.

## II

### *Sufficiency of the Evidence*

Defendant contends there was insufficient evidence to support his conviction on any of the 14 counts. He argues reversal is required because the only evidence presented at trial supporting his convictions was the testimony and pretrial statements of B., which the record shows were "fabricated, exaggerated and embellished." Defendant again fails to set forth a complete summary of the evidence material to the issues he contends are not supported by the evidence and provides only *one* citation to the record.

By failing to support his insufficiency of the evidence argument with proper citations to the record, defendant has forfeited his claim of error.[6] " ' "The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. [Citation.] It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings." ' " (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282.) " ' "The reviewing court is not called upon to make an independent search of the record where this rule is ignored." ' " (*Id*. at p.

---

[6] In his reply brief, defendant again erroneously insists that he adequately cited to the record in support of his insufficiency of the evidence argument, pointing to the information set forth in the statement of facts section of his opening brief, which spans more than 53 pages. As we have noted *ante*, this does not satisfy the relevant requirements for appellate briefing.

283.)  It would be unfair to other litigants and a waste of our time if we were " 'required to perform tasks which are properly those of appellant['s] counsel.' " (*Ibid*.)

In any event, defendant has failed to show that the evidence presented at trial was insufficient to support his convictions.  He acknowledges that B. testified regarding the incidents of molestation underlying his convictions and that B.'s SAFE interview was played for the jury, but argues that reversal is required because B. was not a credible witness, as shown by his inconsistent and impossible/improbable statements and other evidence presented at trial.  We disagree.

The relevant inquiry " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  A reviewing court neither reweighs the evidence nor reevaluates the credibility of witnesses.  (*People v. Jennings* (2010) 50 Cal.4th 616, 638.)  " 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.)  "Inherently improbable . . . means that the challenged evidence is 'unbelievable per se [],' such that 'the things testified to would not seem possible.'  [Citation]  The determination of inherent improbability must be made without resort to inference or deduction, and thus cannot be established by comparing the challenged testimony to other evidence in the case." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 725.)  "While an appellate court can overturn a judgment when it concludes the evidence supporting it was 'inherently improbable,' such a finding is so rare as to be almost nonexistent." (*Id.* at p. 728.)  "The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?— rather than the apparent credibility of the person testifying." (*Id*. at p. 729.)  "In other words, the challenged evidence must be improbable ' "on its face." ' " (*Ibid*.)  "The only

question is:  Does it seem *possible* that what the witness claimed to have happened actually happened?"  (*Ibid*.)

Even considering the record cites identified by defendant in his reply brief, he cannot show that this case is one of the rare cases in which the evidence supporting his convictions was physically impossible or inherently improbable.  Because there was possible and plausible evidence supporting the charges, and the jury found that evidence credible despite the purported weaknesses defendant points to on appeal, we cannot second-guess that determination.  (See *People v. Hovarter* (2008) 44 Cal.4th 983, 996 [except in rare instances of demonstrable falsity, doubts about the credibility of a witness should be left for the jury's resolution].)  Accordingly, this claim fails on the merits.

III

*Admission of Uncharged Act of Sexual Misconduct*

Defendant contends the trial court prejudicially erred in admitting evidence of an uncharged act of sexual misconduct under Evidence Code section 1108.  We disagree.

A.  *Additional Background*

The prosecution filed a pretrial motion requesting permission to introduce evidence of an uncharged act of sexual misconduct committed by defendant under Evidence Code sections 1101, subdivision (b) and 1108, subdivision (a).  In support of its motion, the prosecution made an offer of proof about a camping trip defendant went on with his 10-year old nephew, C., around 2000.  During that trip, defendant supplied C. with enough wine "to make a grown man tipsy" and then, while they were preparing to go to bed, pushed C.'s hair back and told him that a Native American chieftain from that area use to "kidnap and fuck little boys just like [him]."  Thereafter, defendant directed C. to take all of his clothes off because they needed their body heat to stay warm.  When asked, defendant told C. that he could not keep his underwear on.  According to C., defendant touched him "inappropriately" that evening and, when he woke up the next morning, defendant's naked body was "embracing [his] naked body."  The prosecution

14

argued that evidence of this incident was admissible under Evidence Code section 1108 to prove defendant's propensity to engage in the charged sexual offenses and was not inadmissible pursuant to Evidence Code section 352.

The defense filed its own pretrial motion, seeking an order excluding any testimony from C. about the camping trip. Among other things, defendant argued that the evidence was inadmissible under Evidence Code section 1108 because the incident with C. did not amount to a "sexual offense" for purposes of admission under the statute.

At the hearing on the motions, the trial court ruled that the uncharged sexual misconduct evidence was admissible under Evidence Code section 1108. In so ruling, the court found that the evidence proffered by the prosecution, if true, amounted to a "sexual offense" within the meaning of the statute, as it met the elements for a violation of section 288, subdivision (a). Thereafter, the court considered the relevant factors and determined that the evidence was admissible under Evidence Code section 1108 and not inadmissible pursuant to Evidence Code section 352.[7]

B. *Applicable Legal Principles*

California law generally prohibits the introduction of character evidence to prove a defendant's propensity to commit conduct on a specific occasion. (Evid. Code, § 1101, subd. (a); *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) Specifically, Evidence Code section 1101, subdivision (a) instructs that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or

---

[7] The trial court did not clearly rule that the uncharged sexual misconduct evidence was admissible under Evidence Code section 1101. The court did specifically rule that the evidence was admissible under Evidence Code section 1108. We limit our analysis to whether the evidence was properly admitted under Evidence Code section 1108. (See *People v. Erskine* (2019) 7 Cal.5th 279, 296 [if the evidence is admissible under Evid. Code, § 1108, the reviewing court need not determine whether the evidence was also admissible under Evid. Code § 1101].)

evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Evidence Code section 1108 is an exception to the general rule against the use of propensity evidence stated in Evidence Code section 1101. It provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evid. Code] Section 1101, if the evidence is not inadmissible pursuant to [Evid. Code] Section 352." (Evid. Code, § 1108, subd. (a).) Evidence Code section 1108 thus permits the admission of evidence that the defendant in a sexual offense prosecution "committed other sexual offenses to prove his propensity to commit the charged sexual offenses." (*People v. Cottone* (2013) 57 Cal.4th 269, 281.) Evidence of this type is uniquely probative in sex crimes prosecutions and policy considerations outweigh the general prohibition against propensity evidence. (*Id.* at pp. 285-286; *People v. Falsetta, supra*, 21 Cal.4th at pp. 911-912.) "The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." (*People v. Cordova* (2015) 62 Cal.4th 104, 132.)

"To determine whether [Evid. Code] section 1108 evidence is admissible, trial courts must engage in a 'careful weighing process' under [Evid. Code] section 352. [Citation.] 'Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' " (*People v.*

16

*Daveggio and Michaud* (2018) 4 Cal.5th 790, 823-824.) Although similarity should be considered under the analysis of prejudice versus probative value, "[a]dmissibility under Evidence Code section 1108 does not require that the sex offenses be similar; it is enough the charged offense and the prior crimes are sex offenses as defined by the statute." (*People v. Jones* (2012) 54 Cal.4th 1, 50; see also *People v. Loy* (2011) 52 Cal.4th 46, 63].)

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " ' "Evidence is not prejudicial . . . merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, [an Evid. Code] section 352 objection should fail. [Citation.] ' "The 'prejudice' referred to in [the statute] applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evid. Code] section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' [Citation.] [¶] The prejudice that [the statute] ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. " ' " (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.) We review the trial court's evidentiary ruling for abuse of discretion. (*People v. Cordova*, *supra*, 62 Cal.4th at p. 132.)

C. *Analysis*

We reject defendant's initial contention that the uncharged conduct does not qualify as a "sexual offense" for purposes of admission under Evidence Code section

17

1108.  The statute provides that only evidence of the commission of a qualifying "sexual offense" may be admitted (Evid. Code, § 1108, subd. (a)), and defines a "sexual offense" as including any conduct proscribed by section 288 (Evid. Code, §  1108, subd. (d)).  Section 288, subdivision (a) criminalizes the commission of any lewd or lascivious act on a child under the age of 14 "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ."  (§  288, subd. (a).)  "The statute is violated if there is ' "any touching" of an underage child accomplished with the intent of arousing the sexual desires of either the perpetrator or the child.'  [Citation.]  Thus, the offense described by section 288[, subd.](a) has two elements:  ' "(a) the touching of an underage child's body (b) with a sexual intent." ' "  (*People v. Villagran* (2016) 5 Cal.App.5th 880, 890; see *People v. Lopez* (1998) 19 Cal.4th 282, 289 [even if an act is innocuous and inoffensive to an outside observer, any touching of a child under the age of 14 constitutes a violation of the statute if it is accompanied by the intent to arouse or gratify the sexual desires of either the perpetrator or child]; *People v. Martinez* (1995) 11 Cal.4th 434, 444, 451 [§ 288 applies to any sexually motivated touching of a child under the specified age and can involve any part of a child's body].)  Because intent for purposes of section 288 can seldom be proven by direct evidence, it may be inferred from the circumstances, including any extrajudicial statements made by the defendant, other acts of lewd conduct admitted or charged in the case, the relationship of the defendant and the victim, and any coercion, bribery, or deceit used to obtain the victim's cooperation or to avoid detection.  (*Martinez*, at p. 445; *Villagran,* at p. 891.)

        We see no error in the trial court's determination that the evidence proffered by the prosecution qualified as a "sexual offense" for purposes of admission under Evidence Code section 1108.  "[T]he 'gist' of the offense [under § 288] has always been the defendant's intent to sexually exploit a child, not the nature of the offending act."  (*People v. Martinez*, *supra*, 11 Cal.4th at p. 444.)  Here, the prosecution's offer of proof as well as the subsequent testimony at trial showed that defendant directed his 10-year

18

old nephew, C., to sleep naked with him while they were alone on a camping trip after defendant supplied C. with a significant amount of wine and told C. a story about how young boys who used to live in the area had been kidnapped and raped by an adult male. While the two were naked, defendant had extensive bodily contact with C., and defendant's naked body was embracing C.'s naked body when C. woke up the next morning. Contrary to defendant's contention, the proffered evidence, if true, was sufficient to support a finding that defendant touched an underage child's body with the requisite sexual intent.[8]

Defendant argues the evidence should have been excluded under Evidence Code section 352 because the uncharged conduct was dissimilar to the charged sexual offenses, the conduct was too remote in time, the proffered evidence of the conduct provided no degree of certainty that the incident amounted to a sexual offense, and the evidence was highly prejudicial and had minimal probative value. According to defendant, the evidence was unduly prejudicial because it was likely to evoke a strong emotional reaction from the jury, and, because there was no conviction, the jury was invited to conclude he was a child molester and find him guilty of the charged offenses to punish him for the uncharged conduct. We conclude that defendant has failed to carry his burden of rebutting the strong presumption favoring the admissibility of uncharged

_____

[8] Citing C.'s trial testimony, defendant, for the first time in his reply brief, accuses the prosecution of providing the trial court with a false and misleading offer of proof about the camping incident. He argues specifically that the testimony at trial proved the conversation involving rape took place the day *after* the naked sleeping rather than the evening before. This is disingenuous. The transcript is clear that after an initial summary that lumped significant events together and resulted in a sustained objection to "narrative," C. testified in a manner substantially similar in all material respects to the prosecution's offer of proof about the camping incident, including that the conversation at issue took place on the first evening the two camped, "as [they] were taking stuff out of the Jeep" and *prior* to defendant's instruction to C. to take off all of this clothes, including his underwear.

19

sexual offense evidence under Evidence Code section 1108 to show propensity to commit the charged sexual offenses. (*People v. Merriman* (2014) 60 Cal.4th 1, 42.)

We begin our analysis by observing that evidence of the uncharged incident of sexual misconduct was highly relevant to show defendant's propensity for committing the charged sexual offenses. "[A] 'prior sexual offense is indisputably relevant in a prosecution for another sexual offense.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.) "Indeed, the reason for excluding evidence of prior sexual offenses in such cases is not because the evidence lacks probative value; rather, it is because ' "it has too much." ' " (*Id*. at p. 283.)

We disagree with defendant's contention that the uncharged conduct was "remarkabl[y] dissimilar" to the charged offenses. To the contrary, there are substantial similarities. As defendant concedes, the victims were both young male relatives, who were around the same age when the incidents occurred. Further, the uncharged conduct and the charged offenses involved defendant using his position of authority, power, and trust to isolate young boys in his care, convince them to take their clothes off, and then touch them inappropriately. In the uncharged incident and in many of the incidents giving rise to the current charges, defendant took his clothes off when the victims did. That the type of touching was different in kind and occurred more often against B. does not demonstrate the court's ruling was an abuse of discretion. (See *People v. Mullens* (2004) 119 Cal.App.4th 648, 660 [any dissimilarities in the alleged incidents relate only to the weight of the evidence, not its admissibility].) Here, the similarities between the uncharged conduct and the charged offenses far outweigh the differences. As such, evidence of the uncharged conduct was highly probative of defendant's propensity to molest young male relatives, i.e., commit the charged offenses. (See *People v. Frazier* (2001) 89 Cal.App.4th 30, 33, 40 [evidence that defendant sexually abused his niece and cousins is admissible to show propensity to molest young female relatives]; *People v.*

20

*Soto* (1998) 64 Cal.App.4th 966, 991-992 [propensity evidence highly probative of defendant's sexual misconduct when left alone with young female relatives].)

In view of the substantial similarities between the uncharged incident of sexual misconduct and the charged offenses, we are unpersuaded that the uncharged conduct was too remote. " 'No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible.' [Citation.] ' "[S]ubstantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses." ' " (*People v. Robertson* (2012) 208 Cal.App.4th 965, 992.) Under the circumstances, we conclude the uncharged incident, which occurred 14 to 16 years before the current offenses were committed and 19 years before trial, was not too remote in time.[9] (See *ibid.* [no error in admitting 34-year-old prior sexual assault conviction]; *People v. Pierce* (2002) 104 Cal.App.4th 893, 900 [sex crime committed 23 years before current crime was admissible]; *People v. Branch, supra,* 91 Cal.App.4th at pp. 284-285 [upholding admission of a sex crime committed 30 years before charged offense]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 ["20 years is not too remote"].)

Finally, we reject defendant's contention that evidence of the uncharged conduct should have been excluded because "it was highly prejudicial but had no probative value." As we have explained, the evidence had substantial probative value and thus was harmful to the defense in that it tended to prove the People's case, but it was not prejudicial in the legal sense. (See Evid. Code, § 352.) Our Supreme Court has recognized that uncharged sexual misconduct not resulting in a conviction could increase the likelihood that the jury (1) will attempt to punish defendant for the uncharged conduct, and (2) confuse the issues because the jury has to determine whether the

---

[9] Defendant mistakenly characterizes the uncharged incident as occurring "19 years before the currently charged offenses." The uncharged incident occurred in or around 2000, whereas the current offenses occurred between December 2014 to June 2016.

uncharged conduct actually occurred. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) However, nothing in the record suggests that C. was not telling the truth about the camping incident, and nothing in the record suggests the jury was confused or attempted to punish defendant for the uncharged sexual misconduct. In accordance with CALCRIM No. 1191, the jury was instructed to consider the evidence of the uncharged conduct only for the purpose of showing that defendant was disposed or inclined to commit sexual offenses, and was admonished that the evidence was not sufficient by itself to prove defendant was guilty of the current offenses; the People had the burden of proving each charge beyond a reasonable doubt. We presume that the jurors understood and followed the trial court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.) The jury instructions, combined with the fact that the testimony describing the uncharged conduct was not more inflammatory than the testimony concerning the conduct giving rise to the current charges, minimized the risk the jury would consider the evidence for a prohibited purpose. (See *Ewoldt,* at p. 405 [potential for prejudice decreased where testimony describing uncharged misconduct was no stronger and no more inflammatory that testimony concerning the charged offenses].) Finally, we note that the evidence of the uncharged conduct included the testimony of a single witness, which reduced the risk of confusing the jury by conducting a trial within a trial. Similarly, we conclude there was no possibility of admitting less prejudicial evidence supporting the incident; offering a single witness to testify about the incident and subjecting that witness to cross-examination is nearly the bare minimum that the prosecution could have done to admit the evidence.

In sum, we conclude the trial court did not abuse its discretion by admitting evidence of the uncharged sexual misconduct under Evidence Code section 1108. In light of our conclusion, we need not and do not consider defendant's argument that the asserted evidentiary error was prejudicial. Nor do we consider the People's forfeiture or harmless error arguments.

## IV

### *Judicial Misconduct*

Defendant contends the trial court committed prejudicial misconduct by denigrating his trial counsel in front of the jury and implying that his witnesses were unworthy of being heard.  Although unfortunate, the trial court's single instance of expressed impatience, followed the next day by an apology in front of the jury, did not translate to prejudicial misconduct.

A.  *Additional Background*

Prior to trial, the defense filed a witness list that included 10 potential witnesses.  As noted *ante*, to accommodate defendant's medical condition, the trial proceedings ended at noon each day.

During the defense case, while defense counsel was questioning his eighth witness on a Friday, the following exchange occurred:

"The Court:  We are going to stop there.  It is noon.

"How many more witnesses do you have after this witness, [defense counsel]?

"[Defense Counsel]:  Four.

"The Court:  Four more?  You told me yesterday you had four witnesses to go, and this is your fourth witness today.

"[Defense Counsel]:  I did, Your Honor, and there was some testimony that requires officers to come and testify, so I'm going to say that there is three more.

"The Court:  I want to make it clear I want this case over Monday, so you guys figure out how you are going to do it.

"We are past time on this case.  You keep adding witnesses.  Stop it.  We need to move this forward.

"Both sides, I want this case finished on Monday, and if you don't think you can, stick around and we'll talk about it."

After the jury was excused for the day, defense counsel complained about being told to "stop it" in front of the jury while he was defending his client. The following exchange then occurred:

"The Court: What do you want to say, [defense counsel]?

"[Defense Counsel]: To be castigated by this Court for doing my job -- and I'm going to continue doing my job --

"The Court: This case has gone on too long. You keep telling me you have so many witnesses. Now you've added four new witnesses to the witness list on the day we are supposed to end the trial.

"Is the Court somewhat annoyed? Yes. You never told me about this. No one gave me any advance notice of it.

"I'm getting ready to tell the jury, as we leave, that we'll probably be wrapping this case up on Monday, and you surprise the Court by telling the Court you have four additional witnesses on Monday that I didn't know anything about. So yes, . . . it is time for this case to wrap up.

"I don't know what these four witnesses are about, and I can't fathom there would be any need to call any further witnesses that are not on the witness list currently, but you are telling me there is, so . . .

"[Defense Counsel]: I think the Court misunderstood, Your Honor. I didn't mean four brand-new witnesses.

"I intend to bring an officer to impeach one of the witnesses this morning that she gave a statement to, which is fair and completely reasonable give the totality of the circumstances and the testimony."

The trial court explained that it was surprised about the additional witnesses, and stated that it should have been told that the case was going to extend another day so it could advise the jury. The court further explained that it was not denying defense counsel the opportunity to call additional witnesses; it was "just pushing [him] to get

things a little more organized." The court acknowledged that it was the responsibility of the parties to present their respective cases to the jury, but noted that it had the responsibility to make sure the case stayed on schedule and the parties used "the jury's time as wisely as possible."

Later in the discussion, the trial court admitted that it has been a "little impatient" and apologized to defense counsel, explaining that it was trying to stay on the schedule given to the jury and believed "things could be moved along a little quicker."

At the outset of the proceedings the following Monday morning, the trial court admonished the jury as follows:

"I do want to indicate to you, the jurors, last week, please ignore anything that I said in front of you. Sometimes my impatience gets the better of me, but do not consider anything I do or say ever in trial as an indication of what I think about the facts, the witnesses, or what your verdict should be.

"To the parties, I apologize for my impatience with you last week.

"What the jury needs to understand, and what sometimes happens is, my job is to move this case along, obviously. But ultimately this case is here. We are here because of the parties. Both of these parties have a right to present their case to you, and when they present their case to you, there are some difficulties of getting witnesses together, a variety of issues that come up.

"They have a right to present their case, and to present their best case they can. And so if it takes a little extra time, we'll do what we need to do to make sure that they can present all of the facts to you."

On that same day, the defense filed a motion for mistrial, arguing that such relief was warranted due to the prejudice from the trial court's remarks. The defense asserted that the trial court "belittled defense counsel and defense witnesses when it told [counsel] to 'Stop it' after counsel relayed to the Court that he would need to call four additional witnesses, given the unexpected testimony that transpired during trial." According to the

25

defense, "[t]he trial court essentially insinuated that defense counsel's witnesses were frivolous and insignificant, effectively undermining the defense's strategy. The trial court's remarks before the jury undoubtedly conveyed to the jury 'the impression that he favored the prosecution. . . . [T]he court's remark of 'Stop it' was said as an exclamation, with the court's voice raised on those two words directed at [defense counsel]. The remarks and temperament of the court clearly portrayed an evident hostility between the court and defense counsel, and it is reasonably probable that these errors will affect the jury's deliberations, to [defendant's] detriment."

The trial court denied the motion, finding that the defense suffered no harm or prejudice from the challenged remarks. The court explained that its statement to "Stop it" in front of the jury was a directive for counsel to stop adding witnesses, not to stop defending his client. The court also disagreed that it had "belittl[ed] the defense." The court acknowledged that it was frustrated and "not pleased" when defense counsel stated that he intended on calling four additional witnesses the court had not anticipated would be called, but noted that it never told counsel that he could not call the witnesses in front of the jury and did not prohibit the defense from calling the witnesses. The court further noted that it had orally admonished the jurors not to consider anything it said or did in rendering their verdicts, and that the jurors would be given written instructions conveying the same.

B. *Applicable Legal Principles*

"We review claims of judicial misconduct on the basis of the entire record." (*People v. Peoples* (2016) 62 Cal.4th 718, 789.) "A trial court should . . . refrain from making comments before the jury that might suggest it has allied itself with the prosecution. [Citation.] For example, '[a] trial court commits misconduct if it "persists in making discourteous and disparaging remarks to a defendant's counsel . . . and utters frequent comment from which the jury may plainly perceive that the testimony of the

26

witnesses is not believed by the judge, and in other ways discredits the cause of the defense . . . .” ’ ” (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.)

“ ‘ “ ‘[O]ur role . . . is not to determine whether the trial [court’s] conduct left something to be desired, or even whether some comments would have been better left unsaid.  Rather, we must determine whether the [court’s] behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.’ ” ’ ” (*People v. Seumanu, supra*, 61 Cal.4th at p. 1321.)

A new trial motion is typically governed by section 1181, which delineates nine grounds for a new trial.  Section 1181 states that a new trial motion may be granted only on the grounds stated in that section, and judicial misconduct is not one of the listed grounds.  Nonetheless, “new trials are frequently granted on nonstatutory grounds where the failure to do so would result in a denial of a fair trial to a defendant in a criminal case.” (*People v. Davis* (1973) 31 Cal.App.3d 106, 109.)  “The power to grant a new trial on such nonstatutory grounds obviously is derived from the trial court’s constitutional duty to insure an accused a fair trial.” (*Id*. at p. 110.)

“ ‘ “The determination of a motion for a new trial rests so completely within the court’s discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.” ’ ” (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

C. *Analysis*

The record reflects an isolated display of impatience and frustration on the part of the trial court toward defense counsel, which does not in and of itself constitute misconduct. (*People v. Snow* (2003) 30 Cal.4th 43, 78 [judicial misconduct not shown where trial judge was sometimes impatient with the attorneys and engaged in a few “especially contentious” exchanges with defense counsel].)  “[M]anifestations of friction between [the trial] court and counsel, while not desirable, are virtually inevitable in a long trial.” (*Id*. at pp. 78-79.)  Bias and partiality are not demonstrated by “expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of

27

what imperfect men and women, even after having been confirmed as . . . judges, sometimes display." (*Liteky v. United States* (1994) 510 U.S. 540, 555-556.)

Defendant has not shown misconduct and makes no effort to demonstrate the trial court's behavior was so prejudicial that he was denied a fair trial. He offers no explanation as to why the trial court's admonition to the jury did not cure any possible prejudice or harm to the defense from the challenged remarks. Instead, he effectively concedes the alleged misconduct did not deny him a fair trial, stating: "This instance of judicial misconduct may not have been sufficient, in and of itself, to deny the [defendant] a fair trial and due process. However, it contributed to the overall unfairness of the trial and, coupled with other prejudicial errors, it denied [defendant his] right to a fair trial." We cannot conclude the trial court abused its discretion in denying defendant's motion for new trial.

As we have rejected the judicial misconduct claim on the merits, we do not consider the People's forfeiture or harmless error arguments.

V

*Cumulative Error*

Defendant contends the cumulative effect of the errors he has asserted requires reversal. "In examining a claim of cumulative error, the critical question is whether [the] defendant received due process and a fair trial. [Citation.] A predicate to a claim of cumulative error is a finding of error. There can be no cumulative error if the challenged rulings were not erroneous." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Because we have found no error, defendant's claim necessarily fails.

28

# DISPOSITION

The judgment is affirmed.


                                               /s/
                                       Duarte, J.


We concur:


      /s/
Raye, P. J.


      /s/
Robie, J.